Fred A. WINDOVER

v.

SPRAGUE TECHNOLOGIES, et al.

Civ. No. 5–92–164 (WWE).

United States District Court,
D. Connecticut.

Aug. 25, 1993.

## RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO STRIKE

EGINTON, Senior District Judge.

Plaintiff Fred Windover brings this civil rights action under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Plaintiff also brings a state law claim for tortious interference with a business expectancy. Defendants moved for summary judgment pursuant to Fed.R.Civ.P. 56 on March 12, 1993. Plaintiff then cross-moved for summary judgment, after which defendants moved to strike evidence submitted by the plaintiff in connection with his summary judgment papers. For the reasons set forth below, the defendants' Motion for Summary Judgment will be granted and their Motion to Strike will be denied in part and granted in part. Plaintiff's Cross Motion for Summary Judgment will be denied.

### FACTS

Plaintiff was employed for 23 years as a lawyer for defendant Sprague Electric Co. ("SE"), a subsidiary of Penn Central Corporation ("PCC"). From 1984 to 1987, plaintiff held the positions of Vice President, General Counsel, and Secretary of SE. In 1987, Sprague Technologies, Inc. ("ST") was formed as a holding company for SE. Edward Kosnik was selected as ST's President and Chief Executive Officer, Stephen Meyers was named as ST's Senior Vice President–Administration, and Augustus duPont was appointed ST's Vice President, General Counsel, and Secretary. All three of these officers had worked at PCC prior to the spinoff. Most importantly for the purposes of this case, Kosnik appointed duPont General Counsel because of his experience in complex securities law matters, because he had a

direct working relationship with Kosnik and with members of ST's board of directors, and because he had a good relationship with the law firm of Skadden, Arps, Slate, Meagher and Flom ("Skadden"), which had assisted PCC in the spin-off of SE.

Shortly after ST's formation, ST decided to close SE's corporate headquarters in Lexington, Massachusetts and to consolidate the operations of the two corporate headquarters in Connecticut. Consequently, ST discharged a 34–year old member of SE's legal department and transferred plaintiff and another lawyer, Stuart Kovar, to ST's Greenwich, Connecticut office. Plaintiff was given the additional titles of Staff Vice President, Deputy General Counsel, and Assistant Secretary of ST. He reported to duPont.

In late 1988, ST embarked on a corporate restructuring and downsizing plan to reduce costs and increase profits. Prior to any layoffs, Susan Cummiskey, one of ST's Senior Human Relations Officers, circulated an internal memorandum explaining ST's procedures prior to any expected layoffs. The memo stated:

> [W]e are requesting that all units submit the names of all salaried and hourly employees who are to be terminated or laid off to me or Gus duPont prior to any action being taken. We will review the affected employees to determine the Company's liability from an Equal Employment Opportunity and potential charge of discrimination standpoint. We will ensure that this legal review does not hinder any business decisions or slow down the process.

While this memo appears to indicate that the company was taking the anti-discrimination laws into consideration, plaintiff contends that no meaningful review of potential liability was conducted.[1] Also in connection with the potential reduction in force, Kosnik told plaintiff that the anti-discrimination laws would not prevent ST from downsizing.

ST ultimately discharged approximately one-third of the personnel within each of its corporate departments in 1988. Kovar, the

---

1. In addition, plaintiff contends that Cummiskey was biased against older employees because she

often referred to them disdainfully as "old boys."

thirty-six year old lawyer who was transferred to Greenwich the year before, was terminated during this restructuring. The average age of executives employed by ST increased from 39.9 years to 42.5 years in 1988.

Because ST's economic performance did not improve after the 1988 downsizing, in 1990 ST determined that a further reduction in force would be necessary. In connection with this second downsizing, Kosnik allegedly told duPont to get rid of the "Sprague old guard," which plaintiff contends applied to him. Ultimately, ST discharged everyone in its legal department, except for duPont. ST also discharged a number of employees from other departments. After this second downsizing, the average age of executives employed by ST increased from 42.5 years to 43.5 years.

Plaintiff received a notice of termination in the spring of 1990 and was given a termination date in July, 1990. At this time, plaintiff also received information about the severance benefits to which he would be entitled. Plaintiff claims he, not duPont, should have been retained as General Counsel of ST in 1990, since duPont was not qualified for the job in that he was not a member of the Connecticut bar.

After notifying Windover about his termination, ST changed its plans and decided to spin-off SE's semiconductor division. Pursuant to this decision, ST planned to make Windover General Counsel of the semiconductor division. Plaintiff's termination date was extended indefinitely, by an oral agreement, until the semiconductor division was spun-off. Meyers, ST's Senior Vice President of Administration, told plaintiff that if he became General Counsel of the spin-off company, he would not be entitled to severance benefits. Although this appears to be consistent with ST's policy of not providing severance to employees who transfer to different Sprague divisions, plaintiff challenged Meyer's position on severance. The parties do not appear to have reached an agreement on this issue.

In August, 1990, Sanken Electric Company, Ltd. ("Sanken"), a Japanese company, expressed an interest in buying SE's semiconductor division, thereby eliminating the need for a spin-off. To facilitate the deal, ST agreed to pay a retention bonus to specific prospective key employees of the semiconductor division who agreed·to stay with the new Sanken semiconductor company ("Allegro") for a year after the sale. ST also agreed to pay a relocation benefit to Windover. The retention and relocation benefit package was worth approximately $75,000. Plaintiff was among the employees offered the retention bonus, since ST contemplated that Sanken would hire plaintiff as General Counsel of the new company.[2] While the sale was being arranged, Windover continued to serve in his same position with ST.

In September, 1990, Windover filed an age discrimination complaint against ST with the Connecticut Commission on Human Rights and Opportunities ("CCHRO") and with the Equal Employment Opportunity Commission ("EEOC"). After this complaint was filed, ST sent plaintiff an "alternatives document." This document required plaintiff to choose between terminating his employment with ST and receiving the standard severance package or transferring to the semiconductor division prior to closing and receiving the relocation package. According to plaintiff, ST attempted to force him to choose between these two alternatives in retaliation for filing a discrimination claim. In the past, other ST executives were not denied severance benefits when they took jobs with other corporations which continued former ST operations.

Plaintiff claims he chose to continue to work for ST until his effective termination date, the date of sale, so that he would be eligible for his severance benefits, relying on ST's prior representation that the only requirement for receiving the retention and relocation benefit package was for him to work at Allegro for at least one year after the sale. Defendants contend that plaintiff transferred to the semiconductor division prior to or contemporaneously with the sale,

---

**2.** Although ST supported Sanken's hiring of plaintiff, plaintiff negotiated his own employment deal with Sanken.

and therefore, was eligible for the retention benefits but not eligible for severance benefits. The evidence presented to the court shows that ST had no control over whether Sanken chose to hire plaintiff as general counsel and that there was no requirement that plaintiff transfer to the semiconductor division prior to its sale to Sanken in order to be eligible for the retention benefits.

Plaintiff argues that defendants manipulated company paperwork to make it falsely appear as though plaintiff transferred within Sprague, thereby disqualifying him from receiving severance benefits, and that defendants delayed a portion of his relocation package in retaliation for his filing a discrimination complaint with the CCHRO and EEOC. In addition, plaintiff claims that defendants discriminated against him on the basis of his age when they decided to eliminate his position, discharge him, and retain duPont as the General Counsel of ST. Finally, plaintiff contends that duPont tortiously interfered with plaintiff's business expectancy by failing to inform ST that he was not a member of the Connecticut bar, and therefore not qualified to be General Counsel of ST.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. *American Int'l Group, Inc. v. London American Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). Although "summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated ... [t]he summary judgment rule would be rendered sterile ... if the mere incantation

of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

### *Age Discrimination Claims*

■ Counts One through Three of the Complaint allege that defendants violated the ADEA by eliminating plaintiff's position, retaining duPont as General Counsel, denying plaintiff severance benefits, and delaying payment of his relocation package because he filed a complaint with the CCHRO and EEOC. In considering an ADEA claim the court follows the three-part *McDonnell Douglas* burden shifting analysis by which plaintiff first must establish a prima facie case of discrimination, in which case the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for discharge. The plaintiff then has the burden of proving that the proffered reason is merely a pretext for discrimination. The plaintiff must first prove his prima facie case of discrimination by showing that: 1) he was in the protected age group of persons forty and older; 2) he was qualified to do his job; 3) he was discharged; and 4) the discharge occurred in circumstances which could give rise to an inference of age discrimination. *Hollander v. American Cyanamid Co.,* 895 F.2d 80, 83 (2d Cir.1990) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). In a case of unlawful retaliation, the fourth element of the plaintiff's prima facie case is the existence of a causal connection between the protected activity and the adverse employment decision. *Id.* at 85; *Cronin v. ITT Corp.,* 737 F.Supp. 224, 229–30 (S.D.N.Y. 1990), *aff'd,* 916 F.2d 709 (2d Cir.1990).

■ The burden of establishing a prima facie case of discrimination is not an onerous one. *Sweeney v. Research Found. of St. Univ. of N.Y.,* 711 F.2d 1179, 1184 (2d Cir. 1983) (citing *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)); *Meiri,* 759 F.2d at 996 n. 10. When making all inferences and construing all ambiguities in favor of plaintiff, the court finds that plaintiff

has established a prima facie case of discrimination. Plaintiff was fifty-one years old at the time he was terminated, and thus within the protected age group; he was qualified to perform the job of General Counsel of ST; and a younger employee took on his responsibilities. Further, plaintiff was discharged under circumstances giving rise to an inference of discrimination in that ST executives had indicated they wanted to get rid of the "Sprague old guard;" that the Senior Human Relations Officer had shown a negative attitude towards older employees at a time when she was the person in charge of ensuring that ST complied with the anti-discrimination laws during its downsizing; and that ST appears to have changed its position regarding plaintiff's entitlement to severance benefits and delayed his relocation package after plaintiff filed a discrimination charge with the CCHRO and EEOC.

■ Because plaintiff has stated a prima facie case of discrimination and discriminatory retaliation, defendants must articulate a legitimate reason for their actions. The employer's reason must be clear and specific. *Dister v. Continental Group Inc.*, 859 F.2d 1108, 1115 (2d Cir.1988). Reduction in force is a legitimate non-discriminatory reason for termination. However, " 'even during a legitimate reorganization or workforce reduction, an employer may not dismiss employees for unlawful discriminatory reasons.' " *Maresco v. Evans Chemetics*, 964 F.2d 106, 111 (2d Cir.1992) (citation omitted). The court finds that defendants' proffered reasons for terminating plaintiff are legitimate. Plaintiff does not dispute the legitimacy of defendants' claim that ST needed to downsize in order to stay profitable, he only disputes ST's reasons for retaining duPont as General Counsel instead of hiring him for that position.

The law is clear that ST had the discretion to decide what non-discriminatory qualifications were necessary to fulfill the job of General Counsel, and the court will not attempt to second guess its business judgment. *Diamantopulos v. Brookside Corp.*, 683 F.Supp. 322, 328–29 (D.Conn.1988). In this case, defendants have stated that they chose to keep duPont because of his expertise in

securities laws, particularly in the area of mergers and acquisitions, and because of his good working relationship with Kosnik and Skadden. The court finds that defendants' proffered reasons for eliminating plaintiff's position and retaining duPont are legitimate.

■ In contrast, this court is unable to determine whether defendants' proffered reasons for denying plaintiff severance benefits and delaying his relocation package after he filed a complaint with the CCHRO and EEOC are legitimate. Defendants claim that plaintiff was not entitled to severance benefits because he was transferred to the semiconductor division, that the dispute over severance benefits arose prior to the filing of the CCHRO complaint, and that there was no delay in providing his relocation package, or if there was a delay, it was the fault of plaintiff. Plaintiff denies these claims and argues that defendants manipulated company documents to make it appear as if plaintiff was transferred. Genuine issues of fact exist regarding 1) the circumstances of plaintiff's employment status at ST after July, 1990; 2) whether plaintiff was ever employed by the semiconductor division; 3) the timing of the dispute over severance; 4) and whether his relocation package was delayed. Accordingly, summary judgment with respect to Count Two of the Complaint is inappropriate at this time.

■ Since defendants have articulated legitimate reasons for eliminating plaintiff's position and retaining duPont as General Counsel, this court now must determine whether Windover has shown that the proffered reasons are merely a pretext for discrimination. A plaintiff may meet this burden either directly, by proving that a discriminatory reason more likely than not motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Maresco*, 964 F.2d at 110. Plaintiff's burden in the context of corporate reorganization is made greater by the inevitable reduction in force. *Carlton v. Interfaith Medical Ctr.*, 612 F.Supp. 118, 122 (E.D.N.Y.1985).

■ After careful review, the court finds that plaintiff has failed to meet his burden of

showing by either direct or circumstantial evidence that defendants' stated reasons for eliminating his position and retaining duPont as General Counsel were a pretext for age discrimination. Even resolving all ambiguities and inferences in favor of plaintiff, defendant is entitled to summary judgment on these claims as a matter of law.

First, the fact that duPont was not a member of the Connecticut bar in 1990 does not in any way help plaintiff show that ST's reasons for retaining duPont were pretextual. Many Connecticut-based corporations use in-house counsel who are not members of the Connecticut bar for a broad range of legal matters relating to their business affairs. *See* 13 Martindale–Hubbell Law Directory (1991).

While Conn.Gen.Stat. § 51–88 prohibits anyone who is not admitted to the Connecticut bar from practicing law in Connecticut,[3] this court's research has found no Connecticut cases which have held that in-house counsel activity for an interstate corporation constitutes the "practice of law" within the meaning of that statute. In fact, the court in *Grievance Comm. v. Payne*, 128 Conn. 325, 329, 22 A.2d 623 (1941), stated that "[a]ttempts to define the practice of law have not been particularly successful" because of the broad field covered. While it is clear that § 51–88 forbids the performance of any act both in and out of court that is commonly understood to be the practice of law by persons not admitted to the bar, the cases have taken a case by case approach in determining whether a particular act constitutes the "practice of law." *See Perlah v. S.E.I. Corp.*, 29 Conn.App. 43, 46, 612 A.2d 806 (1992); *Grievance Comm. v. Dacey*, 154 Conn. 129, 143, 222 A.2d 339 (1966); *Taft v. Amsel*, 23 Conn.Supp. 225, 228, 180 A.2d 756 (1962).

The court in *State Bar Ass'n of Conn. v. The Conn. Bank and Trust Co.*, 145 Conn. 222, 234–35, 140 A.2d 863 (1958), held that the "practice of law" includes "the giving of legal advice on a large variety of subjects and the preparation of legal instruments covering an extensive field." This case seems to imply that in-house counsel, who typically give legal advice to their corporate employer, would be engaged in the practice of law. Thus, in-house counsel working in Connecticut who are not members of the Connecticut bar probably would be considered to be in violation of § 51–88 by the Connecticut courts. Yet, the large number of in-house counsel working in Connecticut who are not members of the state bar tends to show either that this interpretation of the statute is incorrect or that the statute is not enforced.

In any case, the mere fact that duPont was not a member of the Connecticut bar when ST decided to keep him on as General Counsel does not render him unqualified to be General Counsel. If necessary, duPont could seek admission to the state bar. *Cf. Graham v. Texasgulf, Inc.*, 662 F.Supp. 1451, 1455 (D.Conn.1987), *aff'd*, 842 F.2d 1287 (2d Cir. 1988) (fact that plaintiff was not admitted to any bar in United States did not prevent her from being theoretically qualified for a position as an in-house attorney with a Connecticut-based corporation; no relevance in fact that certain other in-house attorneys were not admitted to Connecticut bar). Even if duPont engaged in the unauthorized practice of law when acting as ST's General Counsel, this is not evidence that ST's reasons for retaining him were pretextual.[4]

---

3. Conn.Gen.Stat. § 51–88 provides in pertinent part:

   (a) A person who has not been admitted as an attorney under the provisions of sections 51–80 shall not: (1) Practice law or appear as an attorney-at-law for another, in any court of record in this state, (2) make it a business to practice law, or appear as an attorney-at-law for another in any such court, (3) make it a business to solicit employment for an attorney-at-law, (4) hold himself out to the public as being entitled to practice law, (5) assume to be an attorney-at-law, (6) assume, use or advertise the title of lawyer, attorney and counselor-at-

law, attorney-at-law, counselor-at-law, attorney, counselor, attorney and counselor, or an equivalent term, in such manner as to convey the impression that he is a legal practitioner of law, or (7) advertise that he, either alone or with others, owns, conducts or maintains a law office, or office or place of business of any kind for the practice of law.

4. There is no evidence that ST viewed membership in the state bar as a prerequisite for initial or ongoing employment with it as in-house counsel. Nor is there any evidence that ST was aware of either plaintiff's or duPont's membership in the state bar or lack thereof.

■ Second, the statements by Cummiskey referring to older employees as "old boys" and by Kosnik regarding the "Sprague old guard" are insufficient to prove pretext. "[I]solated remarks have been rejected by courts as insufficient in establishing an inference of age discrimination," even when made directly to a claimant. *Graham v. Renbrook Sch.*, 692 F.Supp. 102, 108 (D.Conn.1988) (citation omitted); *see also Ostrowski v. Atlantic Mutual Ins. Co.*, 968 F.2d 171, 182 (2d Cir.1992) ("stray remarks" in workplace by people who were not involved in pertinent decision making process not enough to prove discrimination); *Tighe v. All Brand Importers, Inc.*, 814 F.Supp. 237, 239 (D.Conn.1992) (statements regarding a "youthful and aggressive" sales force and rumors about a youth movement were legally inadequate to prove that defendant's cited reason for discharge was pretextual); *Blumensaadt v. Standard Prods. Co.*, 744 F.Supp. 160, 164 (N.D.Ohio 1989) (being called an "old lady" was insufficient proof of disparate treatment of older workers); *aff'd*, 911 F.2d 731 (6th Cir.1990); *Perry v. Prudential–Bache Sec., Inc.*, 738 F.Supp. 843, 851 (D.N.J.1989) (statements describing plaintiff as "a stupid old bastard" and "burned out and forgetful" were insufficient evidence of age discrimination), *aff'd*, 904 F.2d 696 (3d Cir.1990), *cert. denied*, 498 U.S. 958, 111 S.Ct. 386, 112 L.Ed.2d 397 (1990); *Barnes v. Southwest Forest Ind., Inc.*, 814 F.2d 607, 610 (11th Cir.1987) (plaintiff who was told "you would have to take another physical examination and at your age, I don't believe you could pass it" could not prove age discrimination); *Carpenter v. American Excelsior Co.*, 650 F.Supp. 933, 938 (E.D.Mich.1987) (statements by company official that he liked his salespeople "young, mean and lean" and that plaintiff was not as young as he used to be insufficient to prove discrimination); *La Montagne v. American Convenience Prods., Inc.*, 750 F.2d 1405, 1408 (7th Cir.1984) (recommendation that a "bright young individual" be hired to replace plaintiff and that plaintiff should not be discharged until a younger man was available to replace him not enough to prove discrimination).

■ Third, the fact that Cummiskey circulated an internal memorandum stating that a legal review of potential discrimination claims as a result of the downsizing would not hinder any business decisions or slow down the process is not evidence of discrimination, even if no meaningful review ultimately took place. "Consideration of the potential impact of employment discrimination laws by employers should be encouraged, both for the benefit of the employer and the employee. If consideration of those laws constituted ... evidence of discriminatory intent, employers would avoid examining their potential application instead of attempting to comply with them." *Kesselring v. United Technologies Corp.*, 753 F.Supp. 1359, 1366 (S.D.Ohio 1991). Plaintiff has produced no evidence to show that a meaningful review was not conducted; and assuming defendants did not do a complete review, this memo does not indicate that ST's downsizing was being done for anything other than economic reasons. Further, it appears that Cummiskey was not involved in the decision-making process with respect to Windover's termination, in that she was given notice of her termination about the same time Windover received his notice.

Finally, the fact that the average age of executives employed by ST increased after each reduction in force belies any claim of age discrimination. Indeed, the first lawyers fired at ST were those who were younger than plaintiff. ST's conduct with respect to plaintiff does not appear to be anything but helpful. It recommended plaintiff as a candidate for General Counsel of Allegro, chose to retain him at full pay and benefits for five months after his original termination date, and provided him with a relocation package. Since plaintiff has failed to show that defendants' reasons for eliminating his position and retaining duPont as General Counsel were pretextual, defendants are entitled to summary judgment as a matter of law on Counts One and Three of the Complaint.

### *Tortious Interference Claim*

In Count Four of the Complaint, plaintiff claims that duPont tortiously interfered with his legitimate business expectation of being made General Counsel of ST by failing to inform ST that he was not a member of the

Connecticut bar and therefore, unqualified to be General Counsel. Because plaintiff's claim of unlawful retaliation remains, his state law claim is properly before the court as a pendent state law claim.

To prevail upon a claim of tortious interference with business expectancy, a plaintiff must prove the existence of a business expectancy and that the defendant, knowing of that expectancy, intentionally sought to interfere with it; and as a result, the plaintiff suffered actual loss. *Harry A. Finman & Son, Inc. v. Connecticut Truck & Trailer Serv. Co.*, 169 Conn. 407, 415, 363 A.2d 86 (1975). In addition, a plaintiff must show that the defendant engaged in fraud, misrepresentation, intimidation or molestation, or that the defendant acted maliciously. *Dacourt Group, Inc. v. Babcock Indus., Inc.*, 747 F.Supp. 157, 161 (D.Conn.1990).

In this case, plaintiff, as an at-will employee, cannot show that he had a business expectancy that duPont would be fired from his job as General Counsel of ST and that plaintiff would be promoted to that position. Plaintiff has produced no evidence of any promises or representations made to him about being made General Counsel of ST. The mere fact that duPont was not a member of the Connecticut bar, as discussed above, is insufficient to create a business expectancy in plaintiff. Since plaintiff has failed to establish the first element of his cause of action, defendants are entitled to summary judgment as a matter of law on this claim.

### Motion to Strike

Defendants have moved to strike certain evidence submitted in connection with plaintiff's opposition to defendants' Motion for Summary Judgment and in support of plaintiff's Cross Motion for Summary Judgment. First, defendants seek to strike portions of several affidavits pursuant to Fed.R.Civ.P. 56(e). This rule provides in pertinent part:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

Defendants contend that paragraphs 6, 7, 11, 13, 16, 27, 31, 32, 34, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, and 54 of Windover's affidavit should be stricken because they are not based on personal knowledge, are conclusory, or contain inadmissible hearsay or privileged information. As Vice President, General Counsel and Secretary of SE and as Staff Vice President, Deputy General Counsel, and Assistant Secretary of ST, and based on his role in the sale of the semiconductor division, the court finds that Windover had first hand knowledge concerning the information in paragraphs 6, 7, 11, 13, 31, 32, 34, 37, 41, 42, 43, 48, 49, and 54. Paragraphs 16, 38, 39, 40, 44, and 45 will be admitted to the extent they are party admissions or for their relevance as to their effect on the listener and to plaintiff's state of mind. Paragraphs 27 and 47 will be admitted for impeachment purposes. The court takes judicial notice of the information in paragraph 46.

Second, defendants contend that the affidavits of Harold White and George Bateman should be stricken because they lack personal knowledge about the information to which they attest. As former Vice President of Human Resources of ST, the court finds that White has personal knowledge of the information in the affidavit and that the information is relevant to defendants' long-standing policy regarding severance. Likewise, as former Director of Human Resource Operations of ST, the court will admit the affidavit of Bateman in that it contains relevant information regarding discriminatory attitudes at Sprague.

Third, defendants claim that portions of Richard Morrison's, Darnall Burks' and John Chase's affidavits should be stricken because they lack a foundation or are conclusory. As Senior Vice President of ST in charge of the semiconductor division, the court finds that Morrison had personal knowledge as to the information to which he attests and that his affidavit is admissible. Chase's affidavit is admissible for the same reason. The court finds that plaintiff has satisfied the foundation requirement with respect to Burks' affidavit.

Fourth, defendants argue that the affidavit of Jerome Koenig is irrelevant and prejudi-

cial. The court finds that the information contained in this affidavit is relevant to any discriminatory attitudes at the defendant company and will be admitted.

Fifth, defendants contend that plaintiff's Exhibit 4, the Severance Pay Policy, should be stricken for lack of foundation and irrelevance. Since defendants submitted the same severance policy in connection with their Motion for Summary Judgment and because the policy is relevant to defendants' long term policies regarding severance, Exhibit 4 will be admitted.

Sixth, defendants claim that plaintiff's Exhibit 7, STI Group, Inc. Corporate Documents, should be stricken as irrelevant. The court finds that Exhibit 7 is relevant to the status of plaintiff's employment at ST after July, 1990, and therefore, admissible.

Seventh, defendants argue that plaintiff's Exhibit 29 should be stricken as hearsay. The court finds that there is insufficient foundation for this evidence, that it contains hearsay, and thus is inadmissible.

Eighth, defendants claim that plaintiff's Exhibits 30, 31, and 37 are irrelevant and prejudicial. The court finds that Exhibits 30 and 37 are relevant but that Exhibit 31 is irrelevant and, accordingly, it will be stricken.

Finally, defendants claim that plaintiff's Exhibit 36 is in an improper form. Since a party opposing summary judgment need not prove its evidence in a form admissible at trial, and since the information in this exhibit is relevant to plaintiff's case, the court will consider it in connection with this motion.

## CONCLUSION

For the reasons set forth above, defendant's Motion for Summary Judgment [36–1] is GRANTED with respect to Count's One, Three, and Four of the Complaint but DENIED as to Count Two. Plaintiff's Cross-motion for Summary Judgment [50–1] is DENIED. Defendant's Motion to Strike [62–1] is DENIED in part and GRANTED in part.